UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, NATIONAL LAWYERS GUILD, CYNTHIA QUENTIN BROWN, GABRIEL CAMACHO, TAREEF KAWA and DAN KESSELBRENNER,<br><br>    Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,<br><br>    Defendant | 04 11652 NG<br><br>MAGISTRATE JUDGE _____<br><br>CIVIL ACTION NO. |

04 11652 NG

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED ✓
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 7/26/04

## COMPLAINT

### I. INTRODUCTION

1. The individual plaintiffs bring this class action seeking declaratory and injunctive relief on their own behalf and on behalf of a class of similarly situated individuals who use the Massachusetts Bay Transit Authority ("MBTA") system. The organizational plaintiffs seek the same relief on behalf of their members.

2. The plaintiffs seek injunctive relief protecting them from unreasonable seizures of their persons and searches of their briefcases, bags, backpacks, and other parcels, as a condition of riding on the MBTA system. Plaintiffs further seek a declaration that the proposed search policy of the MBTA is unconstitutional on its face and as applied under the Fourth and Fourteenth Amendments to the United States Constitution.

3. On July 16, 2004, the MBTA Transit Police issued a General Order instituting a policy whereby passengers will be required to submit their baggage for inspection, absent any

indicia of cause, as a condition of riding on the MBTA system. The policy calls for searches to be conducted in one of three ways: by electronic device, by explosive-sniffing dog or by physical search. The physical search provision authorizes the MBTA police not only to look into passengers' bags, but also to remove items from their bags and to open any smaller containers inside passengers' bags. These searches constitute an unwarranted invasion of privacy, particularly the physical searches, which result in passengers having to permit the police to go through their belongings in front of other passengers as a condition of utilizing mass transportation.

4. The policy is facially unreasonable and is unreasonable as applied under the Fourth Amendment. The illusion of safety created by the policy will not outweigh the severe intrusion on civil liberties occasioned by its implementation.

## II. JURISDICTION AND VENUE

5. This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343.

6. Venue is proper in this court under 28 U.S.C. §1391(b).

## III. PLAINTIFFS

7. Plaintiff AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE ("ADC"), a non-profit corporation, is a civil rights association with voluntary members of all backgrounds, faiths and ethnicities, committed to defending the rights of people of Arab descent and promoting their rich cultural heritage. Recognizing that the Arab-American community needs a powerful, effective national and local organization to defend its

interests now more than ever, ADC is committed to empowering Arab Americans, defending the civil rights of all people, promoting civic participation, encouraging a balanced U.S. foreign policy in the Middle East, and supporting freedom and development in the Arab World. The Massachusetts chapter of ADC has over 300 members.

8. Plaintiff NATIONAL LAWYERS GUILD ("the Guild"), a non-profit corporation, is a voluntary association of lawyers, law students, legal workers and jailhouse lawyers of America dedicated to the need for basic change in the structure of our political and economic system. The Guild considers the law to be an instrument for the protection of the people, rather than for their repression. Thus, during its 65 year history, the Guild has been an important part of the American people's struggle for real democracy, for economic and social justice, and against oppression and discrimination based on race, ethnicity, immigration status, class, gender or sexual orientation. In its continuing mission, the Guild seeks to safeguard and extend the rights of workers and minority groups, eliminate racism, and protect civil rights and liberties in the face of persistent attacks upon them. Across the United States, Guild members are demanding that civil liberties be protected and that the U.S. Government respect the Constitution. The Massachusetts chapter of the Guild has over 300 members.

9. Plaintiff CYNTHIA QUENTIN BROWN is a rider of the MBTA system. She brings this action on her own behalf and on behalf of all persons who utilize the MBTA system.

10. Plaintiff GABRIEL CAMACHO is a rider of the MBTA system. He brings this action on his own behalf and on behalf of all persons who utilize the MBTA system.

11. Plaintiff TAREEF KAWAF is a rider of the MBTA system and a member of ADC. He brings this action on his own behalf, on behalf of the members of ADC and on behalf of all persons who utilize the MBTA system.

12. Plaintiff DANIEL KESSELBRENNER is a member of the Guild. He brings this action on his own behalf, on behalf of the members of the Guild and on behalf of all persons who utilize the MBTA system.

## IV. DEFENDANT

13. Defendant MASSACHUSETTS BAY TRANSPORTATION AUTHORITY ("MBTA") is a body politic and corporate and a political subdivision of the Commonwealth of Massachusetts with the capacity to be sued. See M.G.L.A. c. 161A §§2, 21.

## V. CLASS ALLEGATIONS

14. Individual plaintiffs BROWN, CAMACHO, KAWAF and KESSELBRENNER bring this action on behalf of themselves and all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2). The class proposed by plaintiffs consists of all users of the MBTA system.

15. The requirements of Rule 23(a) and (b)(2) are met in that the class is so numerous that joinder of all members is impracticable; there are questions of law and fact common to the class; the claims of the representative parties are typical of the claims of the class; the representative parties will fairly and adequately represent the interests of the class because they are represented by counsel with extensive experience in class action litigation and constitutional litigation; and the parties opposing the class purport to act on grounds generally applicable to the class, thereby making appropriate final injunctive and

corresponding declaratory relief with respect to the class as a whole.

## VI. FACTS

### A. The MBTA Policy

16. On July 16, 2004, the MBTA Transit Police issued General Order No. 2004-19, effective July 19, 2004, creating and implementing a first-in-the-nation policy of conducting random searches of bags carried by mass transit passengers. (Attached is a copy General Order 2004-19.)

17. The policy was officially announced and searches pursuant to the policy began on July 22, 2004.

18. Under the General Order, the MBTA police will be conducting searches, referred to in the General Order as "Security Inspections," of handbags, briefcases, and other carry-on items of MBTA system passengers.

19. The searches are "not [to] be based to any degree upon particularized suspicion of criminal activity." See General Order 2004-19, c. 3.1 (emphasis in original).

20. The policy provides that "Security Inspections will be conducted where practical before persons proceed through the 'paid' entrance area of an MBTA station." See General Order 2004-19, c. 4.3 (emphasis in original).

21. The policy states that searches are to be conducted by a minimum of three uniformed MBTA officers and one supervisor.

22. "At the commencement of the Security Inspection process, the Supervisor will establish in writing the frequency of individuals subject to Security Inspections, e.g., that every eleventh passenger with a bag or parcel will be subjected to a Security Inspection." See

id., c. 4.3. The Supervisor may vary the frequency at regularly set intervals, but may do so no more than once per hour.

23. On information and belief, when conducting searches of passengers before they have passed through the "paid" entrances, the MBTA police will implement special methods for passengers to enter stations where searches are being conducted in order to determine which passengers to search. For example, the MBTA will require that all passengers enter through a single entrance via a single file line with the supervisors using hand counters to calculate which passengers to inspect.

24. The policy calls for the searches to be conducted in one of three ways: by using Explosive Detection Dogs (EDD); by using Electronic Scanning Devices (ESD); or by Physical Inspections of passengers' baggage. "Whenever possible, Security Inspections will be conducted by either an Explosive Detection Dog (EDD) or an Electronic Scanning Device (ESD). If neither of these resources are available, a Physical Inspection will be conducted." See General Order 2004-19, c. 4.12.

25. However, on information and belief, as of June 22, 2004, MBTA Police Chief Joseph Carter indicated that, at most the MBTA would be purchasing four ESD and had only four EDD.

26. The Physical Inspections are to be conducted by having passengers open up their carry-on items. The officers conducting the searches are authorized to move around, manipulate and remove any items inside a bag. This applies to all compartments as well. If there are any smaller closed containers inside of a bag, the officer is authorized to remove and open those containers as well.

27. Because of the limited number of ESD and EDD available to the MBTA police, many of the searches conducted will be physical inspections.

28. Pursuant to General Order 2004-19, any person who refuses to stop and submit his or her baggage to a search will either be denied entry into the station or requested to leave MBTA property. If the individual persists on trying to board the MBTA system, the supervisor is to explain the search policy of the MBTA and reiterate that the individual will not be allowed to board unless her or she submits to a search. If the individual continues to refuse to leave after this explanation, the supervisor is to warn the individual that he or she will be arrested for Trespass.

29. General Order 2004-19 provides that the MBTA is to post notices informing MBTA riders that all persons choosing to use the MBTA system will be subject to searches of their carry-on items. These notices are to be posted at least five days before the searches begin and are to remain posted for as long as the MBTA continues to conduct the searches.

30. Currently, there are no such signs notifying passengers of the MBTA's new search policy.

### B. Plaintiff Cynthia Quentin Brown and the Policy As Applied

31. Plaintiff Cynthia Quentin Brown is a resident of Jamaica Plain in Boston, Massachusetts.

32. She is employed as a transcriptionist for North Shore Medical Transcription.

33. She rides the subway five days per week to and from work.

34. To get to work, she always takes the Orange Line from Sullivan Square Station to Back Bay Station. She then takes a bus from Back Bay Station.

35. She takes the reverse route home.

36. She usually carries a purse and frequently brings another bag with her for personal items and food.

37. Ms. Brown will continue to utilize the MBTA system as usual during the Democratic National Convention ("DNC"), taking place in Boston, Massachusetts from July 26 to July 29, 2004.

38. On July 24, 2004, Ms. Brown was onboard the MBTA Orange Line.

39. At Sullivan Square Station, an MBTA police officer boarded the subway car on which she was riding.

40. At the time, she was carrying a purse and a cloth bag.

41. The police officer requested that she allow him to look in her bag. She refused. She pointed out that the officer could see an umbrella protruding from her bag and that it was lying flat.

42. The officer left without requiring her to allow him to examine her bag.

43. The officer examined the bags of other passengers in the car.

44. On July 25, 2004, she boarded the subway at Back Bay Station to go to work.

45. She was carrying only a purse.

46. At Haymarket Station, an MBTA police officer boarded the subway car on which she was riding.

47. Beginning at one end of the car and working his way to the other, the officer began asking passengers to allow him to search their bags.

48. The officer engaged in manual inspections of the bags of the other passengers, including putting his hands into some of the bags.

49. Ms. Brown initially refused to allow the officer to look in her bag.

50. The officer told her that she would have to leave the train. The officer called for other officers to assist him.

51. One of the other officers who arrived took over speaking with Ms. Brown.

52. He said that if she continued to refuse, she would be escorted from the train and would have to leave the station. He advised her that if she remained on the platform, she would be subject to arrest.

53. She advised that, in her opinion, she has a right to refuse permission to search.

54. Eventually, because of the officer's insistence that she either open her bag or leave the train, she unsnapped the center snap on her purse and allowed the officer to look inside.

55. She did not unzip any of the side compartments.

56. After looking at the center compartment, the officer left and allowed her to remain on the train.

57. Later that same day, Ms. Brown boarded the train at Sullivan Square to return home from work.

58. An MBTA police officer boarded the train and began walking down the aisle as other passengers opened their bags for him to look inside.

59. Ms. Brown did not open her bag and was not requested to do so by the officer.

60. As is evidenced by Ms. Brown's experiences, the MBTA will be applying General Order 2004-19 by conducting searches of passengers who are already onboard MBTA vehicles.

61. Passengers who refuse to submit their bags for search will be required to leave MBTA property even though they may not have completed their journeys.

62. As a result of the fact that the searches are being conducted onboard MBTA vehicles, the searches are not being conducted according to a pre-determined sequence of passengers as the policy provides.

63. Thus, officers are free to use their discretion as to which passengers to search.

### C. Plaintiff Gabriel Camacho

64. Gabriel Camacho is a Latino who has lived in Brighton for the past 13 years.

65. Because Mr. Camacho does not own a car, he relies on the MBTA system for transportation.

66. To reach his office in North Cambridge each morning, he takes the "B" train on the Green Line to Harvard Street in Allston, rides the #66 bus to Harvard Square, then transfers onto the #77 bus to Ridge Avenue. He takes the reverse route to commute home at the end of the day.

67. Further, in the course of his work as a Regional Organizer with Project Voice of the American Friends Service Committee, Mr. Camacho travels to various immigrant communities via the MBTA system frequently enough that he purchases a monthly "Zone 1" T Pass.

68. In the course of traveling on the MBTA system, Mr. Camacho frequently changes buses and trains at major transfer points including South Station, North Station, Back Bay, Government Center, Haymarket, Ruggles, Park Street, Porter Square, Harvard Square and JFK.

69. Mr. Camacho always carries some type of bag with him. When attending community meetings, Mr. Camacho usually carries a knapsack containing flyers, brochures,

pamphlets, posters and booklets for distribution. If he is appearing in court or at a press conference, he carries a briefcase. Occasionally, Mr. Camacho must carry equipment such as a slide projector, or a laptop. Finally, when Mr. Camacho has to take a flight for work or otherwise, he takes a large suitcase with him on the blue line to Logan Airport.

70. Mr. Camacho plans to utilize the MBTA during the DNC. As a member of Project Voice, he will be utilizing public transportation to get to and from various social and economic justice, and peace activities surrounding the DNC with which Project Voice and the AFSC are involved.

### D. Plaintiff Tareef Kawaf

71. Tareef Kawaf was born in Damascus, Syria, and maintains a dual citizenship with Syria and the United States.

72. He has lived in the Boston area for nearly 18 years. He currently resides in Cambridge.

73. In order to get to and from his job as the vice president of engineering for a small software start-up company, Mr. Kawaf rides the MBTA subway every weekday. Mr. Kawaf boards the Red Line at Harvard Square Station and gets off at Park Street Station, a major transfer point where the Red and Green Llines converge. At that point, Mr. Kawaf either boards the Green Line to Arlington Station or walks the rest of the way to his office. He takes the reverse route home.

74. Mr. Kawaf almost always carries a backpack with him containing his laptop computer and reading materials. On occasion, he also carries a compact disk player and several compact disks.

75. Mr. Kawaf plans to use the MBTA system as usual during the DNC.

### C. Plaintiff Dan Kesselbrenner

76. Daniel Kesselbrenner has lived in the Boston metropolitan area for the last 25 years. He currently resides in Somerville.

77. Mr. Kesselbrenner is the executive director of the National Immigration Project of the National Lawyers Guild. His office is located on Beacon Street in downtown Boston.

78. To get to and from his office each weekday, Mr. Kesselbrenner takes the MBTA subway. He boards the Red Line at either Porter Square, Davis Square or Kendall Square Stations. On days that he gets on at Kendall Square Station, he takes the #85 bus to get there. He gets off at the Park Street Station stop and walks to his office from there. He takes the reverse route home.

79. Mr. Kesselbrenner always carries a briefcase with him on his way to and from work. The contents of his briefcase include confidential papers and his laptop.

80. In addition to using the Red Line to get to and from work, Mr. Kesselbrenner uses all of the other lines with the exception of the Silver Line, for purposes of attending work-related meetings or other events and for purposes of personal travel.

81. Mr. Kesselbrenner plans to use the MBTA system as usual during the DNC.

### VII. CLAIM

82. The above paragraphs are incorporated by reference.

83. The Fourth Amendment to the United States Constitution provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated."

84. The policy of the MBTA, both on its face and as it is being applied, to seize passengers

and to conduct random searches of their baggage without cause is unreasonable.

85. The degree to which the searches and seizures interfere with individual liberty outweighs the gravity of the public concerns they serve and the degree to which they will advance the public interest.

86. As a direct and proximate result of this policy, plaintiffs and other members of the plaintiff class will be deprived of their rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

## VIII. IRREPARABLE HARM

87. Plaintiffs have a constitutional right to be free of unreasonable searches and seizures.

88. The denial of plaintiffs' constitutional rights constitutes per se irreparable harm.

## VIX. PRAYER FOR RELIEF

WHEREFORE, plaintiffs request the following relief:

(a) a preliminary and permanent injunction enjoining defendants, their agents, employees, assigns and all persons acting in concert or participating with them from seizing any person and/or searching that person and/or his or her belongings, in any way, as a condition of that person's utilizing the MBTA system, without individualized probable cause, except insofar as a brief investigatory stop, based on articulable reasonable suspicion, pursuant to Terry v. Ohio, 392 U.S. 1 (1968);

(b) a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the MBTA Transit Police General Order 2004-19 is unconstitutional;

(c) reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988; and

(d)   any other and further relief as this Court may deem necessary and proper.

Respectfully submitted,

For the Plaintiffs
By their Attorneys,

*Michael Avery*

Michael Avery
BBO #024500
120 Tremont Street
Boston, MA  02108
(617) 573-8551

Howard Friedman
BBO #180080
J. Lizette Richards
BBO #649413
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
(617) 742-4100


Jonathan Shapiro
BBO #546368
National Lawyers Guild
Massachusetts Chapter
14 Beacon Street
Boston, MA 02108
(617) 227-7335

Date: 07/26/04