UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 11652 NG

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, ET AL | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) ) |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, | ) ) ) |
| | ) |
| Defendant | ) ) |

CIVIL ACTION NO.

## MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

### I.    Introduction and Statement of Facts

Plaintiffs have filed this lawsuit seeking an immediate preliminary injunction to prohibit the Massachusetts Bay Transportation Authority (MBTA) from searching the personal possessions of riders on the system without probable cause. Such searches began on July 22, 2004, pursuant to a policy announced on July 16, 2004 (General Order 2004-19, to Chapter 152 of the Department Manual). The plaintiffs have alleged the following facts in their Complaint.

Under the General Order, the MBTA police will be conducting "Security Inspections," of handbags, briefcases, and other carry-on items of MBTA system passengers. The policy provides that searches are *not* to be based to any degree upon particularized suspicion of criminal activity.

Under the policy, Security Inspections are to be conducted where practical before persons proceed through the paid entrance area of an MBTA station. In fact, it is not practical to do this throughout the system and searches take place on the trains

1

themselves. The policy states that searches are to be conducted by a minimum of three uniformed MBTA officers and one supervisor. In an apparent attempt to eliminate discretion on the part of individual officers, the Policy requires that searches be conducted according to a predetermined sequence. The Supervisor is to establish in writing the frequency of individuals subject to Security Inspections, i.e., that every "nth" passenger with a bag or parcel will be subjected to a Security Inspection. The supervisor may vary the frequency at regularly set intervals, but no more than once per hour. Where searches take place on the trains, it is not possible to follow this regime.

When conducting searches of passengers before they have passed through the "paid" entrances, the MBTA police will implement special methods for passengers to enter stations where searches are being conducted in order to determine which passengers to search. For example, the MBTA will require that all passengers enter through a single entrance via a single file line with the supervisors using hand counters to calculate which passengers to inspect.

The policy calls for the searches to be conducted in one of three ways: by using Explosive Detection Dogs (EDD); by using Electronic Scanning Devices (ESD); or by Physical Inspections of passengers' baggage. The former two are the preferred method under the terms of the General Order. However, on June 22, 2004, MBTA Police Chief Joseph Carter indicated that, at most, the MBTA would be purchasing four ESDs. Further, as of that date, the MBTA police had only four EDDs.

The limited number of officers employed by the MBTA, the limited number of ESDs and EDDs, and the large number of stations, entrances and exits, make it impossible for the MBTA to comply with the preference stated in the General Order for

2

searches prior to point where passengers enter the system, and for searches by dogs and wands. As applied, the policy of the MBTA includes a large number of searches on the trains themselves and a large number of physical inspections. Searches of passengers' bags have also taken place by a single officer.

Under the General Order Physical Inspections are to be conducted by having passengers open up their carry-on items. The officers conducting the searches are authorized to move around, manipulate and remove any items inside a bag. This applies to all compartments as well. If there are any smaller closed containers inside of a bag, the officer is authorized to remove and open those containers as well.

Pursuant to the General Order, any person who refuses to stop and submit his or her baggage to a search will either be denied entry into the station or requested to leave MBTA property. If the individual persists on trying to board the MBTA system, the supervisor is to explain the search policy of the MBTA and reiterate that the individual will not be allowed to board unless he or she submits to a search. If the individual continues to refuse to leave after this explanation, the supervisor is to warn the individual that he or she will be arrested for Trespass.

The General Order provides that the MBTA is to post notices informing riders that all persons choosing to use the system will be subject to searches of their carry-on items. Notices were to be posted at least five days before the searches begin and were to remain posted for as long as the MBTA continues to conduct the searches. Currently, there are no such signs notifying passengers of the MBTA's new search policy.

3

## II.    Individual Plaintiffs and Plaintiff Organizations Have Standing to Challenge the Proposed Search Policy

Each of the individual plaintiffs in this case is a person who uses the MBTA transportation system on a regular basis. Each uses it often enough so that he or she is likely to be searched in the future by MBTA security police. Plaintiff Cynthia Quentin Brown has already encountered officers conducting searches three times over a two day period and submitted, over objection, to one search when threatened with ejection from the subway if she did not permit the search. Each of the individual plaintiffs is threatened with an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical. The threatened injury is directly traceable to the challenged actions of the defendant and it is likely, not merely speculative, that the injury will be avoided by a favorable decision in this injunctive action. This is sufficient to meet Article III's standing requirements. *Friends of the Earth, Inc. v. Laidlaw Environmental Services Inc.*, 528 U.S. 167, 180-181 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

An organizational plaintiff will have standing to bring suit on behalf of its members under the following circumstances:

(1) when its members would have standing to sue in their own right;

(2) the interests at stake are germane to the organization's purpose;

(3) neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services Inc.*, 528 U.S. at 181.

Here the interests at stake, the constitutional rights of riders on the MBTA system, are clearly germane to the purpose of the organizational plaintiffs. It is also clear

4

that because only declarative and injunctive relief are requested that the participation of individual members in the lawsuit is not required. Because the individual members of the plaintiff organizations who are riders of the MBTA system do have standing, the organizations themselves are also proper plaintiffs in this case.

Because the MBTA random search policy will systematically result in the searches of riders, standing in this case is not foreclosed by *Los Angeles v. Lyons*, 461 U.S. 95 (1983). In *Lyons* none of the plaintiffs who were challenging the chokeholds employed by Los Angeles police officers could demonstrate to a reasonable certainty that he would be arrested again, let alone that he would be subjected to a chokehold. Here the individual plaintiffs and the members of the plaintiff organizations routinely ride the subways and commuter trains and because searches of personal items will be employed as a matter of policy, that plaintiffs and the members of plaintiff organizations will be subjected to them is virtually certain.

## III. The Random Search Policy Violates the Fourth Amendment Rights of Plaintiffs and other Riders of the MBTA

The MBTA policy of random searches of the bags and packages of subway riders does not satisfy the requirements of the Fourth Amendment. The Supreme Court has held that "a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment." *United States v. Place*, 462 U.S. 696, 707 (1983); *United States v. Chadwick*, 433 U.S. 1, 13 (1977). Taking one's bags onto a train or bus does not forfeit this Fourth Amendment protected interest. *Bond v. United States*, 529 U.S. 334, 336-337 (2000).

The Fourth Amendment requires that all searches and seizures be reasonable. As the Supreme Court recently reiterated in *Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000),

5

"A search or seizure is ordinarily unreasonable in the absence of individualized suspicion

of wrongdoing," citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997). In *Terry v. Ohio,*

392 U.S. 1, 21 (1968), the Court held that police officers are only permitted to make

investigatory stops of an individual if they have a reasonable suspicion that the individual

has committed, is committing, or is about to commit a crime. See also *United States v.*

*Cortez,* 449 U.S. 411, 417-18 (1981); *Brown v. Texas*, 443 U.S. 47, 51 (1979). Thus,

searches pursuant to the MBTA policy, with no individualized suspicion, are

presumptively unconstitutional.

In *Delaware v. Prouse*, 440 U.S. 648, 661 (1979), the Supreme Court held that a

program of random stops of motorists to check drivers' licenses and registration, where

there was no articulable and reasonable suspicion of any violation of the law, violated the

Fourth Amendment because it would subject every occupant of every vehicle on the road

to a seizure "at the unbridled discretion of law enforcement officials."

The requirement of individualized suspicion is an essential element of our

constitutional protection of privacy. As the court pointedly underlined in *Martiszus v.*

*Washington County*, 2004 WL 1632836, at *10 (D. Ore. July 21, 2004):

> If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is
> that a police officer may not detain an individual simply on the basis of suspicion
> in the air. No matter how peculiar, abrasive, unruly or distasteful a person's
> conduct may be, it cannot justify a police stop unless it suggests that some
> specific crime has been, or is about to be, committed, or that there is an imminent
> danger to persons or property. Were the law any different--were police free to
> detain and question people based only on their hunch that something may be
> amiss--we would hardly have a need for the hundreds of founded suspicion cases
> the federal courts decide every year, for we would be living in a police state
> where law enforcement officers, not courts, would determine who gets stopped
> and when.

6

In the present case, the MBTA conducts seizures and searches without individualized suspicion, but it originally proposed to avoid the exercise of "unbridled discretion" by MBTA officers by employing an "objective standard or rule to govern the exercise of discretion." See, *Delaware v. Prouse*, 440 U.S. at 661. The proposed system of searching passengers in a predetermined sequence as they entered a subway station would have operated similarly to the roadblock system employed by the Indianapolis police in *Edmond*, where police stopped a predetermined number of automobiles in a given location based on a fixed sequence from which they could not deviate. *Indianapolis v. Edmond*, 531 U.S. at 35. That scheme was held unconstitutional by the Supreme Court in *Edmond* because it was deemed to have as its purpose the detection of evidence of ordinary criminal wrongdoing, namely drug possession.

In the execution of its policy, the MBTA has swiftly moved to searches inside the trains by individual officers. Under these circumstances, searching according to a predetermined sequence is not possible and individual officer discretion necessarily comes into play. Thus the policy as applied is unconstitutional under *Delaware v. Prouse*.

Stopping passengers who intend to enter a subway station or detaining passengers on a train and requiring them to wait while their bags are inspected, whether by a scanning device, a dog, or manually, constitutes a seizure of the passenger. *Indianapolis v. Edmond*, 531 U.S. at 40; *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450 (1990). It cannot be disputed that a manual inspection of a passenger's bag constitutes a search. *Bond v. United States, supra.* In *Bond* the Supreme Court held that the physical manipulation of a traveler's personal luggage constituted an unconstitutional violation of

his right to privacy, even though the bag was not opened and the examination consisted only of a "probing tactile examination" of the outside of the bag. 529 U.S. at 337. The MBTA policy allows officers to go much further than the police went in *Bond* and actually peer into and move objects about inside a bag, including opening other containers that are found within the bag. Given the limited number of dogs and wands available to the MBTA, it should be anticipated that a majority of the searches will involve such manual inspections.

Seizures and searches in the absence of particularized suspicion have been held constitutional only in an extremely limited category of cases, as noted by the Supreme Court in *Edmond*. To qualify for consideration under this exception, searches must be conducted at fixed checkpoints, which is not how the MBTA policy has been applied. The MBTA does not have the resources to establish an effective fixed checkpoint system. The MBTA policy is thus not similar to fixed checkpoints or roadblocks set up to detect drunken drivers, upheld in *Michigan Dept. of State Police v. Sitz, supra*, or checkpoints to apprehend illegal aliens, upheld in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). Those systems did not involve searches and were held to be constitutional only so long as they involved no more than "an initial stop . . . and the associated preliminary questioning and observation by checkpoint officers." *Michigan Dept. of State Police v. Sitz*, 496 U.S. at 450-451. The opinion in *Edmond* also noted that the Supreme Court had suggested in *Delaware v. Prouse, supra*, that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible.[1]

---

[1]     The Supreme Court in *Edmond* also identified two other types of searches and seizures that might be conducted without particularized suspicion: (1) searches conducted for "special needs beyond the ordinary need for law enforcement," such as random drug testing of students and certain government employees; and (2) administrative searches such as, *e.g., New York v. Burger,* 482 U.S. 691, 702-704 (1987) (warrantless administrative inspection of premises of "closely regulated" business); *Michigan v. Tyler,* 436 U.S. 499, 507-509, 511-512 (1978) (administrative inspection of fire-damaged premises to

Seizures and searches without individualized suspicion that do not take place at fixed checkpoints are unconstitutional. In both *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) and *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975), the Supreme Court held that roving patrols with the goal of locating illegal aliens were unconstitutional in the absence of individualized suspicion. In the latter case the Court specifically held that roving patrols were far more intrusive than fixed checkpoints. 422 U.S. at 894-895. In *Brignoni-Ponce*, the Court held that roving patrols that stopped vehicles in the absence of articulable reasonable suspicion were intolerable because they "would subject the residents of . . . (border) areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. . ." 422 U.S. at 882-883. The MBTA policy subjects riders of the trains to potentially unlimited interference with their use of the mass transit system, solely at the discretion of Transit Police officers, and is similarly constitutionally intolerable. See, *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 845, n. 22 (9th Cir. 2003) (where officers possessed unguided discretion, absent specified criteria, to carry out suspicionless bag searches, search of backpack of person attending political parade could not be justified under "special needs" jurisprudence where there was no organized methodology for systematically checking all individuals and no checkpoints through which all people had to pass before entering the vicinity).

Moreover, the random search policy of the MBTA does not pass the three part balancing test required by the narrow exception carved out for automobile checkpoints for unlicensed or drunken drivers or illegal aliens. *Michigan Dept. of State Police v. Sitz*, 496 U.S. at 455 and *Brown v. Texas*, 443 U.S. at 50-51. The court must balance the

---

determine cause of blaze); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 534-539 (1967) (administrative inspection to ensure compliance with city housing code). 531 U.S. at 37. These rationales do not appear to be relevant to the searches proposed by the MBTA.

State's interest that is served by a checkpoint, the extent to which the checkpoint system in question can reasonably be said to advance that interest, and the degree of intrusion upon individual rights that the checkpoint creates. In *Edmond* the Supreme Court held that, "The constitutionality of such checkpoint programs still depends on a balancing of the competing interests at stake and the effectiveness of the program." 531 U.S. at 47.

The asserted State's interest here is the prevention of a terrorist attack on a metropolitan transportation system. Given the almost unlimited number of potential terrorist targets in urban areas, however, it is impossible to assess the State's interest in establishing a checkpoint at any particular venue without knowing the likelihood of an attack at that location. This Court cannot assess the State's interest in preventing a terrorist attack on the MBTA in the absence of specific evidence concerning threats to the transportation system.

In *Stauber v. City of New York*, 2004 WL 1593870 (S.D.N.Y. July 16, 2004), the court enjoined the City of New York from enforcing its "bag search policy" at demonstrations during the upcoming Republican National Convention. Pursuant to the policy, the police would require people seeking to attend certain demonstrations to consent to a search of their possessions as a condition of entry to the demonstration site. The City argued that the United States government considers the Convention to be a potential terrorism target, and the court noted that newspaper reports confirmed those concerns. The court found, however, that the evidence submitted by the City of the increased risk of violence or of threats to public safety that would be created from the failure to search the bags of demonstrators was overly vague. The court also concluded that the City had provided no information to suggest that the bag search policy would

address the kinds of threats that the NYPD might face at demonstrations. *Id.* at *31.

The intrusion on individual rights that is occasioned by random checkpoint searches of bags and packages on the MBTA system is great. The MBTA policy cannot be compared fairly to infrequent automobile checkpoints to identify drunk drivers or illegal aliens. Most drivers rarely encounter such police checkpoints and when they do, there is only a brief stop, a few questions by the officers and no inspection or searching of personal belongings. The MBTA proposes to initiate a system of screening passengers randomly on a subway system that most riders use on a daily basis. Thousands of passengers will encounter the screening repeatedly.[2]

A large percentage of MBTA riders take the subway on a daily basis to get to work or to school, to shop, and to run necessary errands. Of necessity they carry bags and packages to transport personal items, purchases, personal and confidential papers. The MBTA policy will subject these riders to searches of their personal possessions over and over again. Those people who do not agree to be searched will not be permitted to enter the subway system, or will be forced to leave in the middle of a journey at great inconvenience. The result is that the MBTA policy will impose an unconstitutional condition on access to the public transportation system.

As the First Circuit has noted, "it has long been settled that government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right." *Blackburn v. Snow*, 771 F.2d 556, 568 (1st Cir. 1985). Thus, for example, the state may not condition the use of public highways on compliance with

---

[2]      According to the MBTA, there are 1.1 million riders who use their system in eastern Massachusetts every day. http://www.mbta.com/traveling_t/schedules_index.asp. If the screening program does not impact thousands of passengers each day, it would seem to have little or no value as a program designed to keep terrorists from being able to enter the transportation system.

11

regulatory requirements otherwise violative of due process, *Frost v. Railroad Commission*, 271 U.S. 583 (1925), and it may not condition continued public employment on relinquishment of First Amendment rights, *Perry v. Sinderman*, 408 U.S. 593 (1972), or of Fifth Amendment rights. *Garrity v. New Jersey*, 385 U.S. 493 (1967). Similarly, numerous cases have held that access to governmental and public facilities may not be conditioned upon the surrender of a person's Fourth Amendment rights. See *Cochrane v. Quattrocchi*, 949 F.2d 11 (1st Cir. 1991) (prison visitation may not be conditioned upon submission to unreasonable strip search); *Blackburn v. Snow*, *supra* (same); *Armstrong v. New York State Commissioner of Correction*, 545 F. Supp. 728, 731 (N.D.N.Y. 1982) (continued employment of prison guards may not be conditioned upon submission to unreasonable strip search); *Gaioni v. Folmar*, 460 F. Supp. 10, 13 (M.D.Ala. 1978) (access to civic center may not be conditioned on submission to unreasonable searches). Similarly, the MBTA may not condition access to the transportation system on a waiver of Fourth Amendment rights.

The third prong of the balancing test established by *Edmond* and earlier cases is crucial – whether the proposed checkpoint will be effective in achieving the State's interests. On this basis, the proposed MBTA policy is sorely deficient. First, the MBTA's concerns appear to be based on an undifferentiated fear about transportation systems, based on the attack on a train in Madrid, Spain earlier this year. The MBTA policy thus goes far beyond the sort of response to terrorism that the Supreme Court suggested it might find appropriate in *Edmond*, where the Court wrote, "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee

12

by way of a particular route." *Indianapolis v. Edmond,* 531 U.S. at 44. The MBTA can make no demonstration that there is a specific threat to the Boston system, or that an attack is imminent. Indeed, to the extent the MBTA proposes to establish a permanent screening system the plan belies any argument that this is a specific response to a particular threat.

Moreover, in a meeting with concerned citizens, MBTA officials announced that they intend to purchase four scanning devices, that they have four dogs trained to sniff explosives and that they intended to field eight teams of four officers each to conduct searches. There are approximately 200 subway and commuter rails stations accessible to each other through the MBTA system.[3] Many of the stations have multiple entrances. At best the MBTA will be able to screen passengers only at certain selected stations or on individual trains each day. The plan will not be effective in preventing potential terrorists from entering the system.

Although the MBTA poses a dramatic justification for the random search policy, the policy provides nothing more than apparent security. This case is similar to *Delaware v. Prouse, supra,* where the Supreme Court held that a random stop scheme to identify unlicensed drivers was unconstitutional because there was no empirical evidence that such stops would be an effective means of promoting roadway safety.[4] Where the Court has approved checkpoint stops of motorists, it has been on the basis of an empirical showing demonstrating a degree of success. *Michigan Dept. of State Police v. Sitz,* 496

---

[3]     Boston Globe, June 23, 2004, Anthony Flint,
http://www.boston.com/news/local/massachusetts/articles/2004/06/23/t_riders_face_more_random_checks/
[4]     The Court concluded in that case, "[i]t seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed." *Delaware v. Prouse,* 440 U.S. at 659-660.

13

U.S. at 454-455 (discussing statistical evidence in *Sitz* and in *Martinez-Fuerte*). There is no such evidence in this case, either of the actual risk of a terrorist attack on the Boston transportation system, or of the effectiveness of the MBTA random search policy in stopping any such attack.

In the present case, as in *Stauber v. City of New York, supra*, the MBTA cannot show "that the invasion of personal privacy entailed by the bag search policy is justified by the general invocation of terrorist threats, without showing how searches will reduce the threat." 2004 WL 1593870 at \*31. This Court should follow *Stauber* and enjoin the bag search policy of the MBTA.

As argued above, given the limited number of dogs and wands available to the MBTA, most searches can be expected to involve the manual inspection of riders' possessions. Moreover, although a dog sniff or a scan by a wand of an unattended bag may not constitute a full-blown "search" under the Fourth Amendment, *United States v. Place*, 462 U.S. at 708, if there is a sufficient intrusion on the person of the passenger by a dog, a search will be found to have taken place. Where a dog sniffs a person, or luggage while it is being carried by a person, the intrusion is a search. *B.C. v. Plumas Unified School Dist.*, 192 F.3d 1260, 1266 (9th Cir. 1999); *Horton v. Goose Creek Independent School District*, 690 F.2d 470, 479 (5th Cir.1982). To the extent that dogs are permitted to go onto crowded trains it is difficult to imagine that the animals will not come into contact with or sniff people directly. The specter of police dogs patrolling crowded subway trains is a nightmarish affront to the Fourth Amendment.

## III.    CONCLUSION

This Court should enjoin searches of MBTA passengers' bags and packages at checkpoints and on trains throughout the transportation system pursuant to the MBTA General Order 2004-19.

Respectfully submitted,

For the Plaintiffs

By their Attorneys,

Michael Avery
BBO #024500
120 Tremont Street
Boston, MA  02108
(617) 573-8551

Howard Friedman
BBO #180080
J. Lizette Richards
BBO #649413
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
(617) 742-4100

Jonathan Shapiro
BBO #546368
National Lawyers Guild
Massachusetts Chapter
14 Beacon Street
Boston, MA 02108
(617) 227-7335

July 26, 2004

15