UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN-ARAB ANTI-<br>DISCRIMINATION COMMITTEE,<br>NATIONAL LAWYERS GUILD,<br>CYNTHIA QUENTIN BROWN,<br>GABRIEL CAMACHO, TAREEF KAWA,<br>and DAN KESSELBRENNER,<br><br>    Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY,<br><br>    Defendant. | CIVIL ACTION NO.<br>04-CV-11652 (GAO) |

### OPPOSITION OF DEFENDANT MBTA
### TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Defendant Massachusetts Bay Transportation Authority ("MBTA") hereby opposes the motion of the Plaintiffs, American-Arab Anti-Discrimination Committee, National Lawyers Guild, Cynthia Quentin Brown, Gabriel Camacho, Tareef Kawa and Dan Kesselbrenner (the "Plaintiffs") for a preliminary injunction (the "Motion") seeking to prohibit the MBTA from "searching the personal possessions of riders on the system without probable cause."

### FACTUAL BACKGROUND

As anyone living in the Greater Boston area undoubtedly knows, the City of Boston is currently hosting the Democratic National Convention. High profile political events such as the Convention are prime targets for terrorist attacks. Indeed, information from intelligence communities at the international, national and regional levels, including

the United States Department of Homeland Security, the United States Secret Service, and the United States Federal Bureau of Investigations indicate that Al-Qeda is curently planning to carry out a large-scale attack in the United States in an effort to disrupt our democratic process. See Exhibit A to Affidavit of Lewis P. Best ("Best Affidavit"), filed herewith. As a result, Secretary Tom Ridge of the Department of Homeland Security has designated the Democratic and Republican National Conventions National Special Security Events and has appointed the United States Secret Service the lead agency for identifying and implementing protective efforts in Boston and New York in connection with these high-profile events. See id.

Based upon past targeting of transit systems by al-Qaeda and other terrorist groups, including the bombings in Madrid, Spain earlier this year, which was also designed to disrupt the democratic process, and the proximity of the venues that have been selected for the Democratic and Republic National Conventions to railroad and mass transit, the Department of Homeland Security is particularly concerned about the convention cities' mass transit systems. See id. In fact, the Department of Homeland Security and the Federal Bureau of Investigations have issued a total of three Directives / Bulletins in the last three months dealing specifically with threats to the nations' mass transit system during this election year. See Exhibit B to Best Affidavit (May 20, 2004 U.S. Department of Homeland Security Transportation Security Directive concerning the threat to passenger rail systems); Exhibit C to Best Affidavit (FBI Bulletin No. 134 dated July 1, 2004 indicating that intelligence reporting indicates a wide range of possible infrastructure targets, including, "subways, passenger trains, freight trains carrying toxic industrial chemicals, rail and vehicle bridges, and tunnels"); Exhibit D to Best Affidavit

(FBI/ Department of Homeland Security Joint Threat Assessment concerning the Democratic National Convention which calls attention to the threat to mass transit during the Democratic National Convention in Boston).

In order to address the threats to the transit system, the Secret Service has issued several directives concerning transportation in and around the Fleet Center during the Democratic National Convention. The Secret Service ordered Interstate Route 93 closed to all traffic during the hours of 4:00 p.m. to 11:00 p.m. during the DNC. See Best Affidavit, ¶ 17. Pursuant to the directive, the only vehicles that are permitted to travel on Interstate Route 93 during that time are emergency vehicles and MBTA buses that contain a certificate indicating that the buses have been screened for explosives and other deadly devices and that all passengers' carry-on items have been subjected to security inspection. See id.

The Secret Service has also issued a directive requiring that all persons nearing the Fleet Center must be searched. See Best Affidavit, ¶20. Consequently, every passenger travelling on the MBTA Orange line, which travels directly below the Fleet Center, must be screened before the train that they are riding nears the Fleet Center. Such inspections are conducted while each train is stopped at either the Haymarket or Community College stations, the stations on either side of the Fleet Center. See Affidavit of John P. Martino ("Martino Affidavit"), ¶ 5.

In addition to the measures that the MBTA is taking in response to the Secret Service's directives, the MBTA has implemented a number of carefully designed, supervised, and documented security measures to address the threats to the Commonwealth's transit system. See Best Affidavit at ¶ 22 – 25. These measures

include security inspections of passengers' handbags, briefcases, and other carry-on items ("Security Inspections"). Such Inspections are conducted in accordance with the General Order issued by MBTA Police Chief Joseph C. Carter on July 16, 2004. A copy of the General Order is attached to the Affidavit of Joseph C. Carter (the "Carter Affidavit") as Exhibit A. The General Order sets forth written guidelines for implementation of Security Inspections on the MBTA transit system. The key provisions of the General Order for purposes of this Opposition are as follows:

- Prohibited Items are defined as any unlawfully possessed firearm or ammunition; explosives (including but not limited to dynamite, nitroglycerin, black powder, fireworks, plastic explosives or blasting caps); inflammable or combustible liquid; acid; poisonous substance, liquid or gas; radioactive article, substance or material; biological or hazardous material; or any kind of device or substance that could be used as a weapon to kill or injure multiple victims on the mass transit system, or that in the manner in which it is being transported poses an unreasonable danger to persons on the mass transit system or to the property, equipment or facilities of the mass transit system.

- Security Inspections are defined as "The inspection of handbags, briefcases, and other carry-on items for the primary purpose of preventing the carrying or placement of any Prohibited Items [as defined in Section 2.1 of the Policy] on the transit system. See Section 2.2.

- Security Inspections are for the purpose of preventing a terrorist attack on the transit system by deterring persons from carrying Prohibited Items aboard MBTA vehicles. See Section 3.0.

- The Policy specifically states that all Security Inspections will be done pursuant to selection criteria in accordance with Sections 4.3 and 4.4 [of the Policy], and shall not be based to any degree upon a particularized suspicion of criminal activity. See Section 3.1.

- It is the policy of the Department that no Officer shall rely to any extent upon a person's race, ethnicity or apparent religious faith or affiliation in conducting a Security Inspection, or otherwise in exercising police discretion, except when responding to a suspect-specific "Be on the Lookout" (B.O.L.O.) alert. It shall be a violation of this policy for any Officer to treat a person differently based on his or her race, ethnicity or apparent religious faith or affiliation. See Section 3.3.

- It is the policy of the Department that Security Inspections are to be conducted in a manner designed to minimize intrusion into the privacy interests of MBTA passengers while preventing acts of terrorism. Whenever possible, Security Inspections will be performed by Electronic Scanning Devices or by Explosive Detection Dogs. Security Inspections shall be conducted in strict observance of the constitutional rights of the parties, with due regard for the safety of all Police Officers, other persons and property involved. See Section 3.4.

- The MBTA will post signs in conspicuous locations at station entrances, within transit vehicles, and at other locations on MBTA property, notifying patrons that all persons choosing to use the MBTA transit system will be subject to Security Inspection of their handbags, briefcases and other carry-on items. Such notices will be posted at least five (5) days before the Department begins to conduct Security Inspections and will remain posted for as long as the Department conducts Security Inspections. See Section 4.1

- Security Inspections will be conducted where practical before persons proceed through the "paid" entrance area of an MBTA station. A Supervisor and a minimum of three (3) Police Officers will be assigned to conduct pre-entrance Security Inspections. See Section 4.3.

- At the commencement of the Security Inspection process, the Supervisor will establish in writing the frequency of individuals subject to Security Inspections, e.g., that every eleventh passenger with a handbag, briefcase, or other carry-on item will be subjected to a Security Inspection. Supervisors may vary the frequency of the individuals subject to Security Inspections at regularly set intervals provided that such changes are documented and occur no more than once an hour. Supervisors will use hand counters supplied by the MBTA Transit Police Department to calculate when inspections will be performed. See Section 4.3.

- Security Inspections will be conducted only pursuant to the Policy and Police Officers will not be permitted to exercise discretion to inspect the carry-on items of any passenger out of the established sequence absent the existence of probable cause or some other constitutional or legal justification. See Section 4.4.

- Security Inspections are only to be conducted of persons choosing to use the MBTA transit system. Consequently, a person may avoid a Security Inspection by electing not to board an MBTA vehicle or enter MBTA property. A person who refuses to allow a Security Inspection will either be denied entry or requested to leave MBTA property. A person's refusal to allow a Security Inspection does not alone constitute probable cause or reasonable suspicion. Therefore, absent other factors that would justify a search based on probable cause or a threshold inquiry based on reasonable suspicion, a person who refuses to allow a Security Inspection will not be detained or questioned. Rather, such person will be denied access to the MBTA transit system or requested to leave MBTA property. See Section 4.6.

GSDOCS-1382773-1

- The Department will provide public information relative to Safety Inspections in multiple languages with the assistance of both private and public organizations dedicated to services to non-English speaking populations. Officers who encounter a non-English speaking passenger, will use the Department's "Language Line" interpreter service. See Section 4.7.

- Officers are authorized to inspect passengers' handbags, briefcases, and other carry-on items. See Section 4.8.

- The duration of each inspection shall be no longer than necessary to inspect the passenger's handbag, briefcase, or other carry-on item(s). See Section 4.10.

- The inspection of any handbag, briefcase, or other carry-on item shall be limited to what is minimally necessary to determine whether the item is being inspected contains any Prohibited Items. See Section 4.11.

There are two exceptions to this procedure during the Democratic National Convention. First, as discussed above, at Haymarket and Community College Stations on the Orange Line, officers are instructed to inspect the handbags, briefcases and carry-on items of every passenger on the trains that will be passing underneath North Station. This is in response to the Secret Service directive that all persons in the vicinity of the Fleet Center must be screened. The other exception relates to MBTA buses traveling on Interstate Route 93 during the period that the roadway is closed to vehicles other than emergency vehicles. The carry-on items of every passenger on those buses will also be screened by officers before the buses leave their departure station.

More than one month before the Security Inspections commenced, the MBTA launched a public information campaign to inform riders about the increased security measures the MBTA was planning to take during the Democratic National Convention. Beginning in early June, the MBTA posted several notices on its internet website and issued several press releases informing the public that the MBTA planned to conduct Security Inspections of passengers' carry-on items. See Exhibits B and C to Carter

Affidavit. In addition, on July 12, 2004, ten days before the MBTA began to conduct Security Inspections of handbags, briefcases and other carry-on items, the MBTA began distributing handouts to passengers informing them of the Security Inspection program. A copy of the handout is attached to the Carter Affidavit as Exhibit D. The handouts provide, in part,

> From now on:
> All MBTA customers will be subject to security inspections of any carry-on item. Your commute may be briefly delayed. Please allow a little time for a potential security inspection of your handbags, briefcases and/or other carry-on items and for other security measures. Your patience is appreciated.

Since July 12, 2004, Police Officers and volunteers have distributed over 100,000 handouts to passengers throughout the MBTA transit system. The MBTA has also been distributing booklets for the last two weeks with information about MBTA service changes during the Democratic National Convention, including the MBTA's Security Inspection Policy. A copy of the booklet is attached to the Carter Affidavit as Exhibit E.

Moreover, in accordance with Section 4.0 of the General Order, poster-sized notices are posted in conspicuous locations in all subway and commuter rail stations in which Security Inspections are conducted. In addition, audio announcements are being made in subway and commuter rail stations notifying passengers that their carry-on items will be subject to Security Inspections. In commuter rail stations, Electronic Message Boards also notify passengers of the Security Inspection Program.

In addition to the notices discussed above, each and every individual passenger whose carry-on items are inspected is given a pocket-sized card explaining the Security Inspection Program. A copy of the pocket-sized card is attached to the Carter Affidavit as Exhibit F. These cards and the handouts described above are also available in

Chinese, Creole and Spanish, in both printed form and via the MBTA internet website. See Exhibit G to Carter Affidavit.

The MBTA commenced its Security Inspection Program on July 22, 2004. During a press conference late in the day, Chief Carter reported that the program ran smoothly. Similarly, the Boston Globe published an article reporting that:

> Police funneled more than 200 commuters through a single entrance to the platform at the Holbrook station, on the Randolph line about 15 miles south of Boston, and sealed off other entry points. They stopped every 11th passenger -- more than 20 people -- and brought them to a table where their bags were swabbed with a sensor pad that then was run through a General Electric explosive-sensing machine. A bomb-sniffing dog was on hand to double-check any bag that tested positive. There were none that required that treatment.

A copy of the Boston Globe article is attached to the Carter Affidavit as Exhibit H.

## ARGUMENT

A preliminary injunction is a drastic and extraordinary remedy, one that should not be granted routinely. See generally Converse Constr. Co. v. MBTA, 899 F.Supp. 753, 760 (D. Mass. 1995) (a preliminary injunction "is not a remedy which issues automatically"). As such, the law imposes on a party seeking an injunction the substantial burden of satisfying four elements: (1) a likelihood of success on the merits; (2) the potential for irreparable harm; (3) the balance of the relevant equities favors him; and (4) the public interest would not be adversely affected by an injunction. See Narragansett Indian Tribe, 934 F.2d at 5; see also Boston's Children First v. City of Boston, 62 F.Supp.2d 247, 253 (D. Mass. 1999) (citations & irrel. hist. omitted).

The Plaintiffs' request for extraordinary preliminary relief should not be granted because it is based on inaccurate statements of the facts and the law and, in any event, fails to establish that the MBTA's Security Inspection Policy violates the Fourth

Amendment to the United States Constitution. Accordingly, the Plaintiffs' Motion should be denied.

## THE PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS COMPLAINT

In considering a request for a preliminary injunction, "the threshold inquiry in this Circuit is on the requirement of success on the merits." See Boston's Children First, 62 F.Supp.2d at 257. In this case, the Plaintiffs have not established that the Security Inspection Policy, as written or as implemented, violates the Fourth Amendment to the United States Constitution. Thus, the Plaintiffs have not met the threshold inquiry, and, therefore, are not entitled to an injunction halting an integral part of the MBTA's security program in the middle of the Democratic National Convention.

Given the similarities in the nature of the threat being addressed and the type of items being inspected, the constitutionality of the MBTA's Security Inspections should be evaluated using the criteria that courts have applied to airport searches and searches conducted of persons entering other public places including courthouses and military facilities. See Commonwealth v. Carkhuff, 441 Mass. 122, 125-126 (2004) (recognizing the vast body of case law concerning screening procedures at airports, courthouses and military installations provide a framework for analyzing the random stopping of motorists to address a terrorist threat).[1] The essence of these decisions is that searches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of a crime, may be permissible

---

[1] In evaluating the constitutionality of the Security Inspections, the Plaintiffs rely on the framework used in cases involving border searches. However, the threat being addressed in those cases, ie, illegal immigration, drug trafficking, and/or driving under the influence, are different threats than the danger of mass destruction posed by a terrorist attack on a mass transit system.

under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched. See United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973).

Even before the recent rash of terrorist activity in the United States and abroad, courts overwhelmingly recognized the constitutionality of administrative searches designed to protect the nation's transportation systems. See United States v. Edwards, 498 F.2d 496, 498 (2nd Cir. 1974) (stating that "[n]othing in the history of the [Fourth] Amendment remotely suggests that the framers would have wished to prohibit reasonable measures to prevent the boarding of vessels by passengers intent on piracy); United States v. Davis, 482 F.2d 893 (9th Cir. 1973) (upholding airport screening searches and stating that "the need to prevent airline hijacking is unquestionably grave and urgent. The potential damage to person and property from such acts is enormous. . ."); see also Commonwealth v. Harris, 383 Mass. 655, 656 (1981) (taking judicial notice that threats of violent acts directed at court houses have given rise to an urgent need for protective measures). Based on justifiable concern about the increasing vulnerability of such places as airports, court houses and military installations, courts have consistently recognized the need for reasonable security measures to guard against the threat to these facilities. Indeed, according to the Second Circuit, "[w]hen the risk is the jeopardy of hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger alone meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and within reasonable scope and the passenger has been given notice of liability to such

search. See United States v. Edwards, 498 F.2d 496, 500 (2nd Cir. 1974) quoting United States v. Bell, 464 F.2d 667, 675 (2nd Cir. 1972).

Although older cases focused primarily on the threat to air travel, recent terrorist activity, most notably the bombing of commuter trains in Madrid, Spain in March of this year, make it clear that the threat of terrorism is not limited to airplanes. Indeed, it appears that today's terrorist groups are targeting all aspects of our nations' infrastructure, as well as our public (and private buildings) and other gathering places.

As a result, the need for administrative searches in areas other than airports and government buildings is undeniable. The Supreme Judicial Court of the Commonwealth of Massachusetts acknowledged this need earlier this year when it stated that "ongoing attempts by terrorists to inflict further death an devastation on our population may increase the number and nature of facilities and locations that must be protected by heightened security screenings. . ." See Commonwealth v. Carkhuff, 441 Mass. 122, 130 (2004).

Contrary to the Plaintiffs' assertions, the threat to these facilities and locations need not be directed to a specific city or facility in order to justify administrative action. Rather, based on prior experience with terrorism or violence, certain types of transportation and types of facilities have been identified as particularly susceptible to attack, and officials may then take steps to prevent such attacks from occurring at other, similar facilities. See Commonwealth v. Carkhuff, 441 Mass. 122, 130 (2004). Therefore, the Plaintiffs' belief that "[g]iven the almost unlimited number of potential terrorist targets in urban areas . . . it is impossible to assess the State's interest in

establishing a checkpoint at any particular venue without knowing the likelihood of an attack at that location" is, quite simply, mistaken and unsupported by the law.

Thus, where, as here, numerous Federal security agencies have specifically acknowledged that prior experience indicates that transit systems are prime targets for future attacks, the threat to the nations' mass transit systems cannot be denied. Moreover, as the bombings in Madrid, Spain demonstrate, Al-Qaeda and other terrorist groups tend to time their attacks so as to disrupt the democratic process. Thus, as Secretary Ridge has recognized, there is reason to be concerned about the transit systems in the cities that are hosting this years Democratic and Republican National Conventions.

There is clearly a need for reasonable security measures to guard against the threat to the MBTA transit system. Like the administrative searches conducted at airports, court houses and other public buildings, the Security Inspections being conducted on the MBTA transit system are "for the purpose of preventing a terrorist attack on the transit system by deterring persons from carrying Prohibited Items aboard MBTA vehicles." See Section 3.0; see also United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973) ("The essential purpose of the scheme is not to detect weapons or explosives or to apprehend those who carry them, but to deter persons carrying such material from seeking to board at all"); Commonwealth v. Carkhuff, 441 Mass. 122, 130 (2004) (discussing as legitimate the purpose of preboarding screening searches at airports "to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings.") The Plaintiffs make much of the fact that the Security Inspections cannot possibly be conducted in all stations and on all passengers. They argue that "if the screening program does not impact thousands of passengers each day, it would seem to

have little or no value as a program designed to keep terrorists from being able to enter the transportation system." However, the Security Inspections are not designed to catch each and every person who attempts to board an MBTA train or vehicle with an explosive or other destructive device. Rather, the purpose of the Inspections is to thwart terrorist activity by making it more difficult for terrorists to plan and carry-out an attack on the system. Counter-terrorism experts advise that these types of security measures, which break up the terrorists' patterns are effective ways to prevent terrorist attacks. Thus, the fact that each and every passenger who attempts to board an MBTA train or vehicle will not get searched does not make the Inspection ineffective, nor its purpose unlawful.

The Security Inspection program should be upheld if it is reasonable in the sense that it "is limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." See United States v. Davis, 482 F.2d at 910. In upholding administrative searches at airports, court houses, and other government buildings, courts have identified various measures, including notice, a limited scope, indiscriminate application, and the existence of a written policy, that operate to minimize the intrusiveness of screening procedures. As discussed below, the MBTA Security Inspection Policy incorporates all of these measures:

a.      Notice

Although notice is not expressly required, courts have repeatedly recognized the advantage of providing it. In particular, courts have recognized that prior notice minimizes the intrusiveness on the person being searched, gives the person a opportunity to avoid the search by electing not to board the aircraft or enter the court house, and also

serves to reduce the fear that might otherwise be experienced. See People v. Hyde, 12 Cal.3d 158, 524 P.3d 830 (1974) (in evaluating administrative searches, it is significant that airline passengers have advance notice that they will be subjected to these inspections and thus may avoid the embarrassment and psychological dislocation that a surprise search causes"); Commonwealth v. Harris, 383 Mass. 655, 657 (noting that where signs were posted at the courthouse entrance warning the public of a search, the element of voluntariness reduced the intrusiveness of the procedure).[2]

As discussed in detail above and in the Affidavit of Chief Joseph C. Carter, the MBTA has gone to great lengths to ensure that the riding public is aware of its intent to conduct Security Inspections. Beginning in early June, the MBTA has provided the following notice to the public:

- Security Alerts and Press Releases on the MBTA website;

- Handouts at all commuter rail and subway stations;

- Audio announcements at various stations throughout the MBTA transit system;

- Poster-sized notices posted in all stations where Security Inspections are being conducted; and

---

[2] Indeed, some courts have held that a person's decision to board a plane (or enter a public building) where signs are clearly posted notifying the public of a search constitutes consent to the search. See Torbet v. United Airlines, Inc., 298 F.3d 1087, (9th Cir. 2002) (passenger impliedly consented to random search by placing his bag on x-ray conveyor belt); United States v. Pulido-Baquerizo, 800 F.2d 899, 901-902 (9th Cir. 1986) (holding that passengers placing luggage on x-ray machine's conveyor belt impliedly consent to a visual inspection and limited hand search of their luggage if the x-ray scan is inconclusive in determining whether the luggage contains weapons or other dangerous objects); Commonwealth v. Davis, 482 F.2d 893, (9th Cir. 1973) (holding that choosing to board aircraft after being given choice of leaving is essentially a "consent" to search, but that evidence of circumstances surrounding the search in the instant case was insufficient to establish consent). Commonwealth v. Harris, 383 Mass. 655, 657 (1981) (upholding trial court judge's decision that search was consensual where signs posted at entrance to courthouse, but, rather than treating the screening process as a consensual search, the court noted that advance notice, and the subsequent voluntary submission to the search procedures "reduced the intrusiveness" of those procedures). see also Morgan v. United States, 323 F.3d 776, 782 (9th Cir. 2003) (holding that a person may impliedly consent to a search on a military base by presenting himself at a gate to a closed military base).

- Pocket-sized cards containing key information about the Inspections.

All of these notices make clear that anyone choosing to use the MBTA transit system will be subject to security inspections.

b.      Limited Scope

The scope of the Security Inspection is well within the acceptable range established by Fourth Amendment case law. The Policy stresses that where practical, non-intrusive search methods will be employed. Physical Inspections will be conducted only when the non-intrusive searches are either inconclusive or unavailable. See Section 3.4. See also United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66 (2nd Cir. 2002); State v. Hanson, 34 P.3d 1 (2001) ("the scope of the airport checkpoint security search may reasonably extend to the indiscernible contents of any containers in luggage" and thus, in instant case, where x-ray did not reveal identity of all contents of defendant's tool box, it proper to open box and then taped-shut container therein).

The Plaintiffs argue that "the limited number of officers employed by the MBTA, the limited number of [Electronic Scanning Devices] and [Explosive Detection Dogs], and the large number of stations, entrances and exists, make it impossible for the MBTA to comply with the preference stated in the General Order for searches prior to point where passengers enter the system, and for searches by dogs and wands." The MBTA is making every effort to conduct inspections by non-intrusive measures. It is not its intent to needlessly resort to Physical Inspections.

c.      Indiscriminate

The case law regarding administrative searches makes clear that the officers conducting administrative searches should not single out certain individuals for different

treatment from others similarly situated. See Commonwealth v. Harris, 383 Mass. 655 (1981). Rather, the searches should be indiscriminate, leaving little discretion up to the searches. See United States v. Green, 293 F.3d 855 (5th Cir. 2002) (upholding checkpoint at which every 6th vehicle stopped); State v. Jackson, 764 So.2d 64 (La. 2000) (requiring "use of a systematic nonrandom criteria for stopping motorists").

Consistent with these cases, the General Order specifically states that all Security Inspections will be done pursuant to the selection criteria to be set by Supervisors and shall not be based to any degree upon a particularized suspicion of criminal activity. See Section 3.1. Moreover, the General Order provides that "no Officer shall rely to any extent upon a person's race, ethnicity or apparent religious faith or affiliation in conducting a Security Inspection, or otherwise in exercising police discretion, except when responding to a suspect-specific "Be on the Lookout" (B.O.L.O.) alert. It shall be a violation of this policy for any Officer to treat a person differently based on his or her race, ethnicity or apparent religious faith or affiliation." See Section 3.3. In accordance with the General Order, as set forth in detail in his Affidavit, each morning Deputy Chief Martino:

> assigns three officers and a supervisor to the locations where security inspections will be conducted and provide the supervisor with a specified range of the frequency of individuals subject to security inspection. For example the range may be nine to twelve meaning that no more than every ninth person and no less than every twelfth person may be searched. I inform the supervisor that the inspection frequency number may be changed after an hour but no more than once per hour so long as the number remains within the designated range. The range may differ from day to day depending on the existing DHS alert level and current intelligence information.
>
> Accordingly, the Officers conducting the Inspections have no discretion with

respect to which passengers to search. Moreover, contrary to the Plaintiffs' assertions, the Officers conducting Inspections on the Orange line do not exercise discretion either. They inspect every carry-on item on the train. Therefore the Plaintiffs' reliance on cases striking down administrative searches based on officers' discretion is misplaced. See Brignoni-Ponce, 422 U.S. 873 (1975); Graves v. City of Coeur D'Alene, 339 F. 3d 828 (9th Cir. 2003).

d.   Existence of a written policy

Several courts have identified the existence of a written policy as a factor to be weighed in considering the constitutionality of an administrative search. See Campbell v. State, 679 So.2d 1168 (Fla. 1996) (roadblock to check drivers' licenses requires "written guidelines [which] specify vehicle selection procedures, duty assignments, detention techniques, and procedures for the disposition of vehicles"); State v. Loyd, 530 N.W.2d 708 (Iowa 1995) (license check roadblock constitutional; one requirement, met here, is a "predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed").

Here, the General Order clearly sets forth the operational guidelines that apply to the inspection of handbags, briefcases and other carry-on items in the possession of persons choosing to ride the MBTA transit system. MBTA Transit Police Department are required to follow the prescriptions in the General Order.

## CONCLUSION

For these reasons, the MBTA respectfully requests that the Court deny the Plaintiffs preliminary injunction motion and grant such other relief as the Court deems just and proper.

Respectfully submitted,

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY

_/s/ Rudolph F. Pierce_
Rudolph F. Pierce (BBO #399380)
Laura E. D'Amato (BBO# 641733)
GOULSTON & STORRS
A Professional Corporation
400 Atlantic Avenue
Boston, MA 02110
(617) 482-1776

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document by causing a copy thereof to be forwarded BY HAND to the following:

Michael Avery, Esq.
Howard Friedman, Esq.
J. Lizzette Richards, Esq.
Jonathon Shapiro, Esq.
Law Offices of Howard Friedman, P.C.
90 Canal St., 5th Floor
Boston, MA 02114

*/s/ Laura E. D'Amato*
Laura E. D'Amato

Dated: July 27, 2004